**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| RICHARD R. BLAKE, JR., *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Civil Action No.: 21-1085 (RC) |
| | : | |
| v. | : | Re Document Nos.: 12, 14 |
| | : | |
| NATIONAL SECURITY AGENCY, | : | |
| | : | |
| Defendant. | : | |

# MEMORANDUM OPINION

## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This case arises out of a Freedom of Information Act ("FOIA") dispute between Plaintiffs Richard Blake, Jr., Samuel Blake, Mary Blake, and Defendant National Security Agency ("NSA"). Plaintiffs seek intelligence information relating to the 1985 disappearance and death of Nicholas Blake—Richard and Samuel's brother and Mary's son. Blake Decl. ¶¶ 1–3, ECF No. 13-2. Nicholas Blake was a U.S. citizen who traveled to Guatemala as a journalist to cover the country's civil war. *Id.* ¶ 2. He, along with a companion, disappeared while last seen on a hiking trip in rural Guatemala in 1985. Ex. A to Blake Decl., Chronology of Blake Family Investigation at 1–2, ECF No. 13-2. Their bodies were discovered and identified many years later, and an investigation revealed that they had both been shot to death. Pls.' Statement Material Facts ¶ 3 ("Pls.' Facts"), ECF No. 13-1. Plaintiffs believe that the Guatemalan Army and Civil Patrols in the region were responsible for Nicholas Blake's death. *Id.* ¶ 4. Decades later, Plaintiffs have still been unsuccessful in obtaining the truth of what happened to Nicholas

Blake. Blake Decl. ¶ 9. They now turn to the NSA for answers, seeking release of radio-telephone communications that the NSA allegedly intercepted in that region and time. The NSA claimed FOIA Exemptions 1 and 3 and refused to confirm or deny the existence of such information. Both parties moved for summary judgment. For the reasons explained below, the Court does not have sufficient information to grant the NSA's *Glomar* response under Exemption 1. But the NSA has adequately shown that its *Glomar* response is justified under Exemption 3. Therefore, the Court will grant the NSA's motion for summary judgment and deny Plaintiffs' motion for summary judgment.

## II. BACKGROUND

On August 23, 2016, Plaintiffs submitted a FOIA request to the NSA seeking records "related to the disappearance and death of Nicholas Blake, a United States citizen, in Guatemala in 1985." Def.'s Statement Material Facts ¶ 1 ("Def.'s Facts"), ECF No. 12-1; Ex. A to Stevens Decl. ("Request Letter"), ECF No. 12-2. Plaintiffs requested, among other things, "digital or audio recordings, or paper or electronically-stored transcriptions of such recordings in the Agency's possession, of [Guatemalan Army] communications during the period March 20 through April 7, 1985, in any way relating to Nicholas Blake and Griffin Davis . . . ." Request Letter at 2. The letter also provided key words and additional context for the search. *Id.* at 3–5. The NSA responded by refusing to confirm "the fact of the existence or non-existence of the materials" and cited FOIA Exemptions 1 and 3 as grounds for its refusal. Ex. B to Stevens Decl. Plaintiffs filed an administrative appeal on October 24, 2016. Ex. C to Stevens Decl. Despite further inquiries from Plaintiffs on the status of their appeal, their case remained on appeal with

the NSA for over four years. Exs. D, E, F to Stevens Decl.[1] Plaintiffs finally brought suit in this Court on April 20, 2021. Compl., ECF No. 1. Less than a month later, the NSA's appeals authority informed Plaintiffs that it "determined that NSA's response was correct." Ex. G to Stevens Decl. Both parties subsequently moved for summary judgment in this case. ECF Nos. 12, 14. In support of its motion, the NSA submitted declarations from Sara K. Stevens, NSA's Deputy Chief of Policy, Information, Performance, and Exports, and Linda M. Kiyosaki, NSA's Chief of Enterprise Guidance Services. *See* Stevens Decl. ¶ 1, ECF No. 12-2; Kiyosaki Decl. ¶ 1, ECF No. 16-1.

## III. LEGAL STANDARD

The Freedom of Information Act is meant "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)). It "directs that 'each agency, upon any request for records . . . shall make the records promptly available to any person' unless the requested records fall within one of the statute's nine exemptions." *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (quoting 5 U.S.C. § 552(a)(3)(a)). "Consistent with the Act's goal of broad disclosure," those exemptions should be "given a narrow compass." *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 151 (1989). "The agency bears the burden of establishing that a claimed exemption applies." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just. ("CREW")*, 746 F.3d 1082, 1088 (D.C. Cir. 2014).

[1] Plaintiffs emphasize the length of this delay but do not argue that the NSA acted in bad faith or that the delay alters the FOIA analysis. Pls.' Cross-Mot. at 3–4. The NSA argues that its delay is only relevant to whether this Court has jurisdiction, which it does not contest. *See* Def.'s Reply Support Mot. Summ. J. and Opp'n Pls.' Cross-Mot. Summ. J. ("Def.'s Reply") at 2, ECF No. 16 (citing *Citizens for Resp. & Ethics in Washington v. FEC*, 711 F.3d 180, 189 (D.C. Cir. 2013)). The Court is satisfied that it has jurisdiction. *See Citizens*, 711 F.3d at 185; 5 U.S.C. § 552(a)(6)(C)(i).

Because FOIA cases do not ordinarily involve disputed facts, they "are typically and appropriately decided on motions for summary judgment." *Moore v. Bush*, 601 F. Supp. 2d 6, 12 (D.D.C. 2009) (citations omitted). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In assessing whether the movant has met that burden, a court "must view the evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in his favor, and eschew making credibility determinations or weighing the evidence." *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008) (citations omitted). "This burden does not shift even when the requester files a cross-motion for summary judgment because 'the Government ultimately has the onus of proving that the documents are exempt from disclosure . . . .'" *Hardy v. ATF*, 243 F. Supp. 3d 155, 162 (D.D.C. 2017) (brackets omitted) (quoting *Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 904–05 (D.C. Cir. 1999)). Even if a FOIA exemption applies, an agency cannot withhold information unless it also "reasonably foresees that disclosure would harm an interest protected by" the exemption. 5 U.S.C. § 552(a)(8)(A)(i)(I); *see Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (explaining the FOIA Improvement Act of 2016's "foreseeable harm" requirement).

Instead of searching for and withholding exempt records, "an agency may issue a *Glomar* response, *i.e.*, refuse to confirm or deny the existence or nonexistence of responsive records if the particular FOIA exemption at issue would itself preclude the acknowledgement of such documents." *Elec. Priv. Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012) (citing *Wolf v.*

*CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007)).[2] In considering a *Glomar* response, courts apply the "general exemption review standards established in non-*Glomar* cases." *Knight First Amend. Inst. at Columbia Univ. v. CIA*, 11 F.4th 810, 813 (D.C. Cir. 2021) (quoting *Wolf*, 473 F.3d at 374). "An agency thus bears the burden to sustain a *Glomar* response." *Id.* (citing 5 U.S.C. § 552(a)(4)(B)).

"[W]hen a *Glomar* response touches upon issues of national security—as is the case here—courts must give agency decisions substantial deference, for judges lack the expertise necessary to second-guess such agency opinions in the typical national-security FOIA case." *Shapiro v. CIA*, 170 F. Supp. 3d 147, 158 (D.D.C. 2016) (cleaned up). Thus, courts "consistently defer[] to executive affidavits predicting harm to national security, and have found it unwise to undertake searching judicial review." *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice,* 331 F.3d 918, 927 (D.C. Cir. 2003). "Courts must sustain an agency's *Glomar* response predicated on a FOIA exemption when the justification for nondisclosure appears logical or plausible." *Shapiro*, 170 F. Supp. 3d at 158 (cleaned up).

## IV. ANALYSIS

The NSA invokes two FOIA Exemptions—1 and 3—as grounds for its *Glomar* response. As described in more detail below, the Court first concludes that the NSA has not waived its *Glomar* response because Plaintiffs have provided no evidence that the NSA has previously disclosed the existence of the requested information. Turning to the merits, the Court finds that the NSA has not provided sufficient detail to show that that the requested information remains classified under Exemption 1. Nonetheless, the NSA has provided sufficient information to

[2] The term "*Glomar* response" is derived from a ship, the *Glomar Explorer*, at issue in a FOIA case, *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976). *See Knight*, 11 F.4th at 813.

satisfy Exemption 3 because the National Security Act protects the agency from disclosing its intelligence functions and activities here. Because Exemption 3 provides a separate and independent ground for the NSA's *Glomar* response, the Court will grant the NSA summary judgment. *See Larson v. Dep't of State*, 565 F.3d 857, 862–63 (D.C. Cir. 2009) ("FOIA Exemptions 1 and 3 are independent; agencies may invoke the exemptions independently and courts may uphold agency action under one exemption without considering the applicability of the other."); *see also ACLU*, 628 F.3d at 619 n.2.

**A. Prior Disclosure**

The Court will first consider whether the NSA has waived its *Glomar* response. "An agency waives any right to make a *Glomar* response by disclosing whether responsive records exist." *Knight*, 11 F.4th at 815 (citation omitted). "Once an agency makes such an acknowledgment, 'there is no value in a *Glomar* response. The secret is out.'" *Id.* (quoting *Leopold v. CIA*, 987 F.3d 163, 167 n.5 (D.C. Cir. 2021)). "To establish official acknowledgment, a plaintiff must identify information in the public domain that (1) matches the information requested, (2) is as specific, and (3) has 'been made public through an official and documented disclosure.'" *Id.* (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990)). This test imposes a "substantial burden" on Plaintiffs to meet. *All Party Parliamentary Grp. on Extraordinary Rendition v. U.S. Dep't of Def.*, 134 F. Supp. 3d 201, 208 (D.D.C. 2015); *see also Am. Ctr. for L. & Just. v. NSA*, 474 F. Supp. 3d 109, 123 (D.D.C. 2020) ("The message is clear: hold agencies to their official disclosures but be precise, lest courts force them to release sensitive information they have not actually disclosed.").

Here, Plaintiffs cannot show that prior disclosure occurred because they have not supplied any evidence that the NSA acknowledged conducting surveillance in the region and

time at issue. They claim that it is "well established" that the NSA was a "careful observer[] of developments in the brutal and bloody Guatemalan Civil War." Pls.' Mem. Opp'n Def.'s Mot. Summ. J. and Support Cross-Mot. ("Pls.' Cross-Mot.") at 7, ECF No. 13-3. Plaintiffs aver that a "two-volume report" published by George Washington University extensively discusses the "'sources and methods' of surveillance operations . . . throughout the region." *Id.* at 7–8. They assert the U.S. government's radio-telephone interceptions were "widely reported in the media" and "discussed extensively in the academic literature." *Id.* at 10, 15; Blake Decl. ¶¶ 7–8. Plaintiffs claim to possess (but did not attach) "U.S. Government documents" such as "diplomatic cables" of U.S. monitoring of "Guatemalan Army unit radio-telephone and radio communications." Pls.' Cross-Mot. at 15. Finally, Plaintiffs conducted telephone interviews of two academic experts and an ex-NSA employee and received "[e]xpert opinions" apparently confirming the NSA's surveillance activities in the region and time. Blake Decl. ¶¶ 7–8. Under the prior disclosure test, however, none of these sources of information constitutes an official acknowledgement by the NSA. *See Knight*,11 F.4th at 816 ("We have also rejected attempts to establish an agency's official acknowledgement based on disclosures by Congress . . . the media . . . [and] the agency's former employees . . . ." (citing cases)); *see also id.* at 817–18 ("[O]ne intelligence agency cannot officially acknowledge a matter for another . . . ."). In short, there is no evidence that the NSA has itself acknowledged or disclosed this information. The Court thus turns to the merits of the NSA's *Glomar* response.[3]

[3] The NSA construed the Request Letter as a request for "intelligence records." Def.'s Facts ¶ 2. Plaintiffs agree with the NSA's interpretation. Pls.' Facts ¶ A; Def.'s Reply at 1. Accordingly, the Court's analysis will be similarly limited in scope. *Cf. Shapiro*, 170 F. Supp. 3d at 156 (requiring the NSA to address non-intelligence records when the requester argued that request was broadly worded to encompass non-intelligence records).

**B. Exemption 1**

Exemption 1 exempts records "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and [which] are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1)(A); *see also Larson*, 565 F.3d at 861. The applicable classification order, Executive Order ("E.O.") No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009), sets forth "both substantive and procedural criteria for classification." *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013). It sets forth, in relevant part, the following conditions: (1) an original classification authority classifies the information; (2) the information is under the control of the United States Government; (3) the information falls under one or more of the categories of information listed in § 1.4 of the order; and (4) the classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, and the authority is able to identify or describe the damage. E.O. 13,526 § 1.1; *see Competitive Enter. Inst. v. Dep't of Treasury*, 319 F. Supp. 3d 410, 417 (D.D.C. 2018).

Here, the parties' dispute over Exemption 1 primarily centers on whether the NSA's *Glomar* response rests on information that is still classified.[4] Specifically, Plaintiffs claim that the requested records are thirty-six years old and therefore subject to automatic declassification under E.O. 13,526. Pls.' Cross-Mot. at 14. Section 3.3 of E.O. 13,526 provides that records

---

[4] Plaintiffs also argue that Exemption 1 can never justify a *Glomar* response because E.O. 13,526 does not shield the fact of whether a document exists. Pls.' Cross-Mot. at 13. But E.O. 13,526 expressly contemplates the use of *Glomar* responses, *see* § 3.6(a) ("An agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order of its predecessors."), and courts routinely permit this practice, *see, e.g.*, *Knight*, 11 F.4th at 821 ("The district court correctly concluded that the intelligence agencies' *Glomar* responses were valid under Exemption 1.").

which "are more than 25 years old and . . . have been determined to have permanent historical value . . . shall be automatically declassified" "except as provided" by exemption. E.O. 13,526 § 3.3; *see James Madison Project v. CIA*, No. 18-cv-03112, 2020 WL 5653577, at *1 (D.D.C. Sept. 23, 2020) ("Executive Order 13526 provides for automatic declassification, except in certain circumstances.").[5] Section 3.3(b) then provides a list of nine exemptions to automatic declassification. Notably, the NSA failed to identify which, if any, of § 3.3(b)'s nine declassification exemptions applied. *See* Pls.' Cross-Mot. at 13 n.7; Def.'s Mem. Support Def.'s Mot. Summ. J. ("Def.'s Mot.") at 4, ECF No. 12 (citing Stevens Decl. ¶¶ 22–26); *cf. Hall v. CIA*, 668 F. Supp. 2d 172, 188 (D.D.C. 2009) ("The records at issue here may well fall into one or more of these [nine] categories, but the CIA has not made such an assertion.").

Instead, the NSA claims declassification exemptions from a different source. As it turns out, § 5.3(b)(2) of the same executive order authorizes an entity called the Interagency Security Classification Appeals Panel ("ISCAP") to "approve, deny, or amend agency exemptions from automatic declassification as provided in section 3.3 of this order[.]" E.O. 13,526 § 5.3(b)(2). The NSA proffers two declassification exemptions from an internal manual called the NSA/CSS's 2018 Declassification Guide, which the ISCAP approved. Kiyosaki Decl. ¶¶ 19–20, ECF No. 16-1; *cf. DiBacco v. U.S. Dep't of the Army*, 234 F. Supp. 3d 255, 272 (D.D.C. 2017) (noting that the CIA Declassification Guide had been approved according to E.O. 13,526), *aff'd*, 926 F.3d 827 (D.C. Cir. 2019). These two exemptions are: (1) "[i]nformation revealing specific sources and methods used by NSA/CSS to collect, and/or process SIGINT and that are currently

[5] Neither party briefed whether the requested information "ha[s] been determined to have permanent historical value." E.O. 13,526 § 3.3. Because the NSA "bears the burden to sustain a *Glomar* response," *Knight*, 11 F.4th at 813, and the NSA does not contest this point, the Court will only analyze the twenty-five-year requirement.

used today" and (2) "[i]nformation revealing NSA/CSS targeting, collecting, or processing diplomatic or leadership communications of specific foreign country/countries, international organization, group of individuals, or individuals after 31 December 1946." Kiyosaki Decl. ¶ 21–22; Stevens Decl. ¶ 24–25.

At this juncture, the Court lacks enough information to allow the NSA to invoke these two exemptions under the Declassification Guide. With respect to the Guide's first exemption, Plaintiffs claim that the 36-year old radio-telephone communications they seek is "substantially obsolete" and therefore not "currently used" by the NSA. Pls.' Cross-Mot. at 15; Pls.' Reply Def.'s Opp'n Cross-Mot. Summ. J. ("Pls.' Reply") at 5–7, ECF No. 17. The NSA did not engage with this point. Pls.' Reply at 6–7; Kiyosaki Decl. ¶ 23 n.6 (arguing that *Glomar* response was appropriate "[r]egardless of the specific technology" in use today). Accordingly, the NSA has not adequately explained why it is eligible to rely on the Guide's first exemption. With respect to the Declassification Guide's second exemption, the NSA claims that communications between military officials constitutes "leadership communications," but makes no attempt to define this term or explain its reach. Kiyosaki Decl. ¶ 23. For example, are communications involving a low-level sergeant or mere civilians—which the request encompasses—also "leadership communications"? Pls. Reply at 7. Therefore, the NSA has not adequately explained why it is eligible to rely on the Guide's second exemption, either.

The NSA's briefing proffers yet one more basis to exempt information from automatic declassification.[6] According to the NSA, in 2014, the ISCAP approved "two file series

[6] This new argument was raised in Ms. Kiyosaki's supplemental declaration in support of the NSA's combined reply and opposition brief. Kiyosaki Decl. ¶¶ 25–27. Even if the NSA did not forfeit this argument, *see Conservation Force v. Jewell*, 160 F. Supp. 3d 194, 204 n.4 (D.D.C. 2016), it is inadequate for the reasons described in this paragraph.

exemptions for NSA records" that exempted "NSA SIGINT Product and SIGINT Cryptanalysis Methodologies . . . from automatic declassification." Kiyosaki Decl. ¶¶ 25–27. The NSA claims that the "summaries of raw data" that Plaintiffs request "would be specific to NSA SIGINT products" and therefore "would be exempt from automatic declassification under NSA's file-series exemptions." *Id.* ¶ 27. Treating the NSA's representation with "substantial deference," *Shapiro*, 170 F. Supp. 3d at 158, the Court nonetheless finds this explanation inadequate. For instance, it is unclear whether the file-series exemptions, assuming they apply in this context, also exempt the "raw data" and any other intelligence information that the request seeks. *See* Kiyosaki Decl. ¶ 27 (claiming that "raw data" Plaintiffs seek is covered by the Declassification Guide's two exemptions whereas "summaries of raw data" are covered by file-series exemptions). Without more context, the Court is not prepared to rule for the NSA on this basis. Therefore, the NSA has not currently satisfied any declassification exemption to show that the requested information is still classified under Exemption 1. Ordinarily, the Court would consider giving the NSA another chance to explain the basis for its *Glomar* response in more detail. That is unnecessary here, however, because the NSA is independently entitled to summary judgment on the basis of Exemption 3.

**C. Exemption 3**

Exemption 3 permits the withholding of records that are "specifically exempted from disclosure by [a different] statute . . . if that statute . . . (i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). Under binding Circuit precedent, the agency must: "[1] show that the statute claimed is one of exemption as contemplated by Exemption 3 and [2] that the withheld material

falls within the statute." *Larson*, 565 F.3d at 865 (citation omitted); *see DiBacco v. U.S. Army*, 795 F.3d 178, 197 (D.C. Cir. 2015) ("[T]he sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." (citation omitted)). Moreover, information need not be classified to fall within Exemption 3's protection. *See Gardels v. CIA*, 689 F.2d 1100, 1106 (D.C. Cir. 1982) (Exemption 3 does not require "first determining that the withheld information was properly classified under Exemption 1" because "Exemption 3 is independent of Exemption 1 and may be invoked independently"); *Afshar v. Dep't of State*, 702 F.2d 1125, 1137 (D.C. Cir. 1983) (same).

Here, the NSA claims that its *Glomar* response is specifically exempted by three statutes: (1) Section 6 of the National Security Act of 1959, 50 U.S.C. § 3605; (2) 18 U.S.C. § 798; and (3) Section 102A(i) of the National Security Act of 1947, 50 U.S.C. § 3024. Kiyosaki Decl. ¶¶ 35–37. "It is well established that each of these [three] statutes qualifies as an Exemption 3 withholding statute . . . ." *Willis v. NSA*, No. 17-cv-2038, 2019 WL 1924249, at *8 (D.D.C. Apr. 30, 2019) (citing *DiBacco*, 795 F.3d at 199; *Larson*, 565 F.3d at 868; *Hayden v. NSA*, 608 F.2d 1381, 1389–90 (D.C. Cir. 1979)). Thus, the only remaining question is whether the withheld information falls within any of these statutes.

The NSA's *Glomar* response falls squarely within Section 6 of the National Security Act of 1959. Section 6 provides that "nothing in this chapter or any other law . . . shall be construed to require the disclosure of the organization or any function of the National Security Agency, or any information with respect to the activities thereof . . . ." 50 U.S.C. § 3605(a). As this Circuit has recognized, "[s]ection 6 . . . provides absolute protection." *Larson*, 565 F.3d at 868 (citations omitted); *see Linder v. NSA*, 94 F.3d 693, 698 (D.C. Cir. 1996) ("The protection afforded by [this section] is, by its very terms, absolute."); *Schaerr v. United States Dep't of*

*Just.*, 435 F. Supp. 3d 99, 114 n.12 (D.D.C. 2020) ("The protections provided by 50 U.S.C. § 3605(a) . . . are absolute." (citations omitted)). Furthermore, "NSA need not make a specific showing of potential harm to national security in order to justify withholding information under Section 6, because 'Congress has already, in enacting the statute, decided that disclosure of NSA activities is potentially harmful.'" *Elec. Priv. Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012) (quoting *Hayden*, 608 F.2d at 1390).

Here, the NSA has explained that "its signals intelligence activities and functions, and its intelligence sources and methods, would be revealed if it were to confirm or deny the existence of information responsive to plaintiffs' FOIA request." Def.'s Mot. at 5 (citing Stevens Decl. ¶ 38). The NSA elaborated that "[a]cknowledging the existence or nonexistence of responsive records on particular individuals or organizations would provide [its] adversaries with critical information about the capabilities and limitations of the NSA, such as the types of communications that may be susceptible to NSA detection." Stevens Decl. ¶ 28. "Over time, the accumulation of these inferences would disclose the targets and capabilities, and therefore the sources and methods, of NSA's SIGINT activities and functions . . . ." *Id.* The Court finds that the NSA's explanation is plainly "logical or plausible." *Shapiro*, 170 F. Supp. 3d at 158 (internal quotation marks and citation omitted); *see People for the Am. Way Found. v. NSA*, 462 F. Supp. 2d 21, 31 (D.D.C. 2006) ("[T]here can be no doubt that the disclosure of SIGINT [material] would reveal information concerning the activities of the agency . . . ." (quoting *Linder*, 94 F.3d at 696)); *Wilner v. NSA*, 592 F.3d 60, 75 (2d Cir. 2009) ("[T]he very nature of their request—which seeks records concerning whether . . . communications were monitored by the NSA—

establishes that *any response* would reveal 'information with respect to the activities' of the NSA.".[7] Accordingly, summary judgment is warranted for the NSA.[8]

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's motion for summary judgment (ECF No. 12) and **DENIES** Plaintiffs' cross-motion for summary judgment (ECF No. 14). An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: July 29, 2022

RUDOLPH CONTRERAS
United States District Judge

---

[7] Where, as here, one statute provides "ample support for the propriety of the NSA's invocation of Exemption 3," the Court "need not opine about the sufficiency of . . . alternative bases." *Agility Pub. Warehousing Co. K.S.C. v. NSA*, 113 F. Supp. 3d 313, 329 n.7 (D.D.C. 2015); *Knight First Amend. Inst. at Columbia Univ. v. CIA*, 424 F. Supp. 3d 36, 42 n.10 (D.D.C. 2020), *aff'd*, 11 F.4th 810 (D.C. Cir. 2021).

[8] Plaintiffs also claim that 22 U.S.C. § 2715a requires a response from the NSA. Pls.' Cross-Mot. at 22–23. This statute provides that "it is in the national interests of the United States to provide information regarding the killing, abduction, torture, or other serious mistreatment of United States citizens abroad to . . . the families of victims of such crimes if they are United States citizens." 22 U.S.C. § 2715a(a)(1). But the same statute limits disclosure by allowing it only "without jeopardizing sensitive sources and methods or other vital national security interests" and when "such disclosure is [not] specifically prohibited by law." *Id.* § 2715a(c). At the very least, the information protected by Exemption 3 meets the latter limitation because it is by definition "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3); *see* 50 U.S.C. § 3605(a) ("[N]othing in this chapter *or any other law* . . . shall be construed to require . . . disclosure . . . ." (emphasis added)); *cf. Linder v. Calero-Portocarrero*, 251 F.3d 178, 183 (D.C. Cir. 2001) (observing that this provision "creates no enforceable rights on behalf of any party. It provides no cause of action. It is simply a general statement of policy").